**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

LORELEY ZAVATTIERO,  DEWI JAMES REES,
ABDUL AHAD AKHTAR, FARRUKH SHAM,
ASHOK KUMAR JAIN, NEELIMA JAIN, TILAK GOUD
CHINTHA, JONATHAN DANIEL NARVAEZ MONTIEL,
MEGAN REES, ALFONSO PARADA GIMENO,
DARREN BAKER, JUNE BAKER, PIETRO
GIUGLIARELLI, JESSICA FINN, HILLARY NABIMANYA,
AMIT PATEL, JORG RUSTER, SARI KATARIINA RUSTER,
JEHANGIR MEHTA, TATIANA NIKOLAYEVNA
LOOBY, IBRAHIM SERHAN, ABDUR RAFAY BADAR,
DENISE SUMMERS, IWO TODOROV STOIANOV,
ANTONIO HRVATSKO VUKMAN, EDMUND THOMAS
LOOBY, PIERANGELO CERIANI, TAMER QUSOUS,
SAMIDH SHRESTHA, KATYA IVANOVA, RASHID
ALMUDAYAN, MARIA GUNILLA HULLERT, JOSEF
PER TURESSON, MAHMOUD ADNAN ALBATARNI,
EDWARD KAKIT WONG, ARHAB MOHAMED HAMOOD
ALSARHI, REGINA NORI, ANNETTE BAKER, GORDON
SHEACH, KRISTINA KOSTADINOVA PAGUREVA,
ASHISH RAMESH AGARWAL, ERWIN HADINATA,
LUIGI PREVIGNANO, MARIA CRISTINA MANNELLO,
CHARBEL AFEICHE, MARINA EID, CHARLOTTE
THOLSBY, MARIA BAARD, ABDELMAJID CHEMLI,
LUIS ANTONIO FRASSON NORI, DHRITI AHUJA,
KAPAN WONG, KOJO UWUSU-NYANTEKYI, FABIO
GAMBINI, ENRICO CALDARI, JOSEPH ZOGHEIB,
LUIGI SCARPA, YAACOV SHMUEL ELLITUV,
OLIVER NESENSOHN, NILANJANA SINHA, MARCELO
PAULO CHENKO, and IVONNE MONTIEL BOHORQUEZ,

Plaintiffs,

v.

BAR WORKS, INC.; BAR WORKS MANAGEMENT, INC.;
BAR WORKS CHAMBERS ST, LLC; BAR WORKS EIGHTH
AVENUE, LLC; BAR WORKS METROPOLITAN, LLC;
BAR WORKS SEVENTH AVENUE, LLC; BAR WORKS
TRIBECA, INC.; BAR WORKS CAPITAL, LLC; BAR
WORKS MIAMI, LLC; RENWICK HADDOW and
ZOIA KYSELOVA

Defendants.

_____

**CIVIL ACTION NO.**
**17 CV 5386(DLC)(GWG)**


**JURY TRIAL DEMANDED**




**AMENDED COMPLAINT**

Plaintiffs Loreley Zavattiero, Dewi James Rees, Abdul Ahad Akhtar, Farrukh Sham, Ashok Kumar Jain, Neelima Jain, Tilak Goud Chintha, Nilanjana Sinha, Jonathan Daniel Narvaez Montiel, Megan Rees, Alfonso Parada Gimeno, Darren Baker, June Baker, Pietro Giugliarelli, Jessica Finn, Hillary Nabimanya, Amit Patel, Jorg Ruster, Sari Katariina Ruster, Jehangir Mehta, Tatiana Nikolayevna Looby, Ibrahim Serhan, Abdur Rafay Badar, Denise Summers, Iwo Todorov Stoianov, Antonio Hrvatsko Vukman, Edmund Thomas Looby, Pierangelo Ceriani, Tamer Qusous, Samidh Shrestha, Katya Ivanova, Rashid Almudayan, Maria Gunilla Hullert, Josef Per Turesson, Mahmoud Adnan Albatarni, Edward Kakit Wong, Arhab Mohamed Hamood Alsarhi, Regina Nori, Annette Baker, Gordon Sheach, Kristina Kostadinova Pagureva, Ashish Ramesh Agarwal, Erwin Hadinata, Luigi Prevignano, Maria Cristina Mannello, Charbel Afeiche, Marina Eid, Charlotte Tholsby, Maria Baard, Abdelmajid Chemli, Luis Antonio Frasson Nori, Dhriti Ahuja, Kapan Wong, Kojo Uwusu-Nyantekyi, Luigi Scarpa, Enrico Caldari, Fabio Gambini, Joseph Zogheib, Marcelo Paulo Chenko, Oliver Nesensohn, Yaacov Shmuel Ellituv, and Ivonne Montiel Bohorquez (collectively, the "Bar Works Investors") allege as follows:

## SUMMARY

1.      This is a case of international financial fraud in which defendants Bar Works, Inc., Bar Works Management, Inc., Bar Works Chambers St., Inc., Bar Works Eighth Avenue, LLC, Bar Works Metropolitan, LLC, Bar Works Seventh Avenue, LLC, Bar Works Tribeca, Inc., Bar Works Capital, LLC, Bar Works Miami, LLC, Renwick Haddow (hereinafter at times individually referred to as "Haddow"), and Zoia Kyselova (hereinafter at times individually referred to as "Kyselova") (collectively, the "Defendants" or "Bar Works") intentionally defrauded at least 62 different individual investors (collectively, the "Plaintiffs" or "Bar Works

Investors") from the following 35 countries: Argentina, Austria, Brazil, Bulgaria, China, Croatia, France, Germany, India, Indonesia, Italy, Ireland, Israel, Jordan, Kuwait, Lebanon, Liechtenstein, Mexico, Nepal, Pakistan, Qatar, San Marino, Saudi Arabia, Singapore, South Africa, Spain, Sweden, Switzerland, Thailand, Tunisia, Uganda, United Arab Emirates, United Kingdom, United States, and Yemen.

2.     From at least 2015 to the present, Defendants Haddow and Kyselova represented to Plaintiffs, as well as to other investors and prospective investors worldwide, that they would pool investor funds for the purpose of acquiring various properties around the United States at which Bar Works would create shared workspaces.

3.     The Bar Works Investors were approached individually, either by representatives of the Defendant companies or through sales agents, and promised a "guaranteed" 14% - 16% yearly return on their investment, plus a 100% repayment of the initial investment amount after a 10 year period.  The Plaintiffs were assured that their investments would be spent on building and developing Bar Works' business, when in reality the individual Defendants diverted the incoming investor funds to perpetuate a Ponzi scheme and to enrich themselves.

4.     The principal architect of this elaborate Ponzi scheme is an individual by the name of Renwick Haddow, a highly experienced con man who is currently under investigation by UK authorities for allegedly engaging in similar fraudulent activity in London. Additionally, Haddow has recently been charged in a Federal Criminal Complaint in the United States District Court for the Southern District of New York for many of the acts related to this Complaint. *Please See* Case No. 17 MAG 4939 (SDNY).  In order to hide his true identity, so as not to frighten away potential investors, Haddow created the fictional alter-ego "Jonathan Black", but

unfortunately for Haddow, his true identity was uncovered by former Bar Works CEO, Franklin Kinard.

### PARTIES, JURISDICTION AND VENUE

5.     Plaintiffs are 62 individual investors located in numerous jurisdictions throughout the United States and in other countries who purchased securities in a New York based company. Their current mailing addresses is the address given below for their counsel of record.  Their names, nationalities and current residences are as follows:

6.     Loreley Zavattiero is an Argentinian citizen currently residing in the United States in the State of North Carolina.

7.     Dewi James Rees is a British citizen currently residing in the UK.

8.     Abdul Ahad Akhtar and Farrukh Sham are British citizens currently residing in the UK.

9.     Ashok Kumar Jain and Neelima Jain are Indian citizens currently residing in the United States in the State of Texas.

10.     Tilak Goud Chintha and Nilanjana Sinha are Indian citizens currently residing in the UK.

11.     Johnathan Daniel Narvaez Montiel is a Mexican citizen currently residing in Thailand.

12.     Megan Rees is a British citizen currently residing in the UK.

13.     Alfonso Parada Gimeno is a Spanish citizen currently residing in Spain.

14.     Darren Baker is a British citizen currently residing in the UK.

15.     June Baker is a British citizen currently residing in the UK.

16.     Pietro Giugliarelli is an Italian citizen currently residing in Italy.

17.     Jessica Finn is a Swedish citizen currently residing in Sweden.

18.     Hillary Nabimanya is a Ugandan citizen currently residing in Switzerland.

19.     Amit Patel is a British citizen currently residing in the UK.

20.     Jorg Ruster and Sari Katariina Ruster are German citizens currently residing in the UAE.

21.     Jehangir Mehta is an Indian citizen currently residing in Thailand.

22.     Tatiana Nikolayevna Looby is an Irish citizen currently residing in Kuwait.

23.     Ibrahim Serhan is a Lebanese citizen currently residing in the UAE.

24.     Abdur Rafay Badar is a Pakistani citizen currently residing in the UAE.

25.     Denise Summers is a British citizen currently residing in the UK.

26.     Iwo Todorov Stoianov is a Bulgarian citizen currently residing in the UAE.

27.     Antonio Hrvatsko Vukman is a Croatian citizen currently residing in South Africa.

28.     Edmund Thomas Looby is an Irish citizen currently residing in Kuwait.

29.     Pierangelo Ceriani is an Italian citizen currently residing in Singapore.

30.     Tamer Qusous is a Jordanian citizen currently residing in Jordan.

31.     Samidh Shrestha and Katya Ivanova are Nepalese citizens currently residing in Switzerland.

32.     Rashid Almudayan is a Saudi Arabian citizen currently residing in Saudi Arabia.

33.     Maria Gunilla Hullert is a Swedish citizen currently residing in Sweden.

34.     Josef Per Turesson is a Swedish citizen currently residing in Sweden.

35.     Mahmoud Adnan Albatarni is a Syrian citizen currently residing in Qatar.

36.    Edward Kakit Wong is a U.S. citizen currently residing in the United States in the State of Texas.

37.    Arhab Mohamed Hamood Alsarhi is a Yemenese and French citizen currently residing in Egypt.

38.    Regina Nori is a Brazilian citizen currently residing in Brazil.

39.    Annette Baker is a British citizen currently residing in the UK.

40.    Gordon Sheach is a British citizen currently residing in the UAE.

41.    Kristina Kostadinova Pagureva is a Bulgarian citizen currently residing in the UAE.

42.    Ashish Ramesh Agarwal is an Indian citizen currently residing in the UK.

43.    Erwin Hadinata is an Indonesian citizen currently residing in Indonesia.

44.    Luigi Prevignano is an Italian citizen currently residing in Italy.

45.    Maria Christina Mannello is an Italian citizen currently residing in Italy.

46.    Charbel Afeiche and Marina Eid are Lebanese citizens currently residing in Lebanon.

47.    Charlotte Tholsby is a Swedish citizen currently residing in Sweden.

48.    Maria Baard is a Swedish citizen currently residing in Sweden.

49.    Abdelmajid Chemli is a Tunisian citizen currently residing in Qatar.

50.    Luis Antonio Frasson Nori is a U.S. citizen currently residing in the United States in the State of Texas.

51.    Dhriti Ahuja is a U.S. citizen currently residing in the United States in the State of North Carolina.

52.     Kapan Wong is a U.S. citizen from the State of Washington currently residing in Hong Kong.

53.     Kojo Uwusu-Nyantekyi is a British citizen currently residing in the UK.

54.     Fabio Gambini is an Italian citizen currently residing in Italy.

55.     Enrico Caldari is an Italian citizen currently residing in San Marino.

56.     Joseph Zogheib is an Lebanese citizen currently residing in Qatar.

57.     Luigi Scarpa is an Italian citizen currently residing in Italy.

58.     Yaacov Shmuel Ellituv is a British and Israeli citizen currently residing in Israel.

59.     Oliver Nesensohn is an Austrian citizen currently residing in Liechtenstein.

60.     Marcelo Paulo Chenko is a Brazilian citizen currently residing in the United States in the State of North Carolina.

61.     Ivonne Montiel Bohorquez is a Mexican citizen currently residing in Mexico.

62.     Haddow is a foreign national believed to be currently domiciled in New York City, New York, whose last know address was 160 West 66th St.

63.     Kyselova is a foreign national believed to be currently domiciled in New York City, New York, whose last known address is 160 West 66th St.

64.      Bar Works, Inc. is a Delaware corporation with its principal place of business in New York City, New York. According to the Criminal Complaint mentioned above the company is wholly owned and controlled by Haddow.

65.     Bar Works Management is a New York corporation. Upon information and belief, it is believed that the company is wholly owned and controlled by Haddow and is part of the scheme of Bar Works, Inc. as mentioned herein.

66. Bar Works Chambers Street is a Delaware limited liability company with its principal place of business in New York City, New York. Upon information and belief, it is believed that the company is wholly owned and controlled by Haddow and is part of the scheme of Bar Works, Inc. as mentioned herein.

67. Bar Works Eighth Avenue LLC is a New York Corporation whose corporation filing address is 116 Eighth Avenue, New York, NY 10011.

68. Bar Works Metropolitan LLC is a New York Corporation whose corporation filing address is 242 Metropolitan Avenue, Brooklyn, NY 11211.

69. Bar Works Seventh Avenue LLC is a New York Corporation whose filing address is 47 West 39th St., New York, NY 10018.

70. Bar Works Tribeca, Inc. is a New York Corporation whose filing address is 47 West 39th St., New York, NY 10018.

71. Bar Works Capital LLC is a California Corporation whose filing address is 47 West 39th St., New York, NY 10018.

72. Bar Works Miami, LLC is a Florida Corporation whose filing address is 47 West 39th St., New York, NY 10018

73. Each of the corporate Defendants (collectively, at times "Bar Works") has been established, controlled, and/or operated by the individual Defendants as part of an ongoing Ponzi scheme, which perpetrated investment fraud in violation of federal securities laws upon the Plaintiffs.

74. This Court has original jurisdiction over this action. 15 U.S.C. § 77v; 15 U.S.C. §78aa; 28 U.S.C. § 1331 and 1332.

75.     This Court has personal jurisdiction over the Defendants who have violated the Securities Act of 1933 and the Securities Exchange Act of 1934. These federal laws permit nationwide service of process upon defendants who maintain sufficient contacts with the United States as a whole. Among other things, the Defendants purposely sought to raise capital from investors located throughout this country and  others, including, without limitation, investors within the State of New York. The Defendants, all of whom are located in the United States, routinely made use of the mails or other means or instrumentalities of interstate commerce, including, without limitation, electronic mail, to solicit and deliver investment contracts.

76.     In addition, all of the Defendants have committed tortious acts and/or violations of federal securities statutes in this state, and the causes of action discussed below arise from this conduct. In addition, all of the Defendants have operated, conducted, engaged in, or carried on a business or business venture in this state. Furthermore, Bar Works, Bar Works Chambers St., and Bar Works Management, have owned, used, and possessed real property in this judicial district, and the causes of action stated below arise from this real property.

77.     Venue for this action is proper in this judicial district under the venue provision of the Securities Act of 1933 and the Securities Exchange Act of 1934 and Title 28 of the United States Code. Among other things, much of the conduct that is the basis for this action was committed in this judicial district.

78.     Any conditions precedent to the imposition of liability upon the Defendants and the assertion of claims by Plaintiffs have been performed, have occurred, or have been waived. Alternatively, the Defendants are estopped to raise any alleged condition precedent.

79.     As the investment contracts were executed by a fictitious person "Jonathan Black", the Plaintiffs, prior to filing this action, demanded rescission of the Investment

Contracts, as they are *void ab initio*, offering to offset the investment income of $5 million previously received by the Plaintiffs and to mark the investment contracts "*void ab initio*" and return same to the Defendants. This demand was ignored, prompting Plaintiffs to file this action.

## BACKGROUND FACTS

80.     Born in or about 1968, Haddow is a foreign national of disrepute who has a checkered past in the United Kingdom. Two of the more unsavory aspects of his background include the following fraudulent schemes:

     a.     On December 10, 2008, the Insolvency Service in the United Kingdom, pursuant to the United Kingdom's Company Directors Disqualification Act 1986, disqualified Haddow for eight years from serving as a company director in the United Kingdom based upon, among other things, his having made false and misleading statements about the financial condition of Branded Leisure, Plc, and his having failed to keep and preserve accounting records for this company.

     b.     On February 14, 2014, in a lawsuit filed in London against Haddow and others by the Financial Conduct Authority (FCA), Haddow was adjudicated by the High Court of Justice (Chancery Division) to have participated, notwithstanding his prior disqualification by the Insolvency Service, in the operation of an unregistered, and, therefore, illegal, "collective investment scheme" involving Capital Alternatives Limited and its affiliates (the "Capital Alternatives Scheme"). On March 25, 2015, this judgment was affirmed in the Court of Appeal (Civil Division).

c.  The Capital Alternatives Scheme is widely regarded as a Ponzi scheme operated by Haddow. E.g., *please see,* Khadija Sharife, World Policy Institute, "Catch and Release," http://www.worldpolicy.org/journal/spring2015/catch-and-release (Spring 2015) (describing Capital Alternatives as "a classical Ponzi scheme—on a global basis.")

## FORMATION OF BAR WORKS

81.  In or about 2014, Haddow entered the United States with his close associate, Kyselova, with whom Haddow shares an apartment in New York City.  On or about July 24, 2015, Haddow and Kyselova founded Bar Works, causing the entity to incorporate in Delaware and to establish its headquarters in New York City.

82.  Haddow and Kyselova are the owners of Bar Works and exercise complete control over this entity.

83.  Haddow has been the chief executive officer and director of Bar Works, Kyselova also has been a director and operations executive of Bar Works, and Kinard has been an officer and director of Bar Works.

84.  On or about December 21, 2015, Haddow caused Bar Works Management to incorporate in New York and establish its headquarters in New York City in the apartment shared by him and Kyselova.

85.  Bar Works, as the parent corporation, controls Bar Works Management.

86.  In or about October 2015, Bar Works opened its first shared workspace location at 47 W. 39th Street, Manhattan.

87.     Since October 2015, Bar Works has created shared workspaces at other locations, including three more in Manhattan (Times Square, West Village, and Tribeca--on Chambers Street) and two more outside of New York City, including the Miami neighborhood known as Wynwood Miami and San Francisco.

88.     According to its website, from 2015 to 2017, Bar Works, has raised money to open another eight locations, including three more locations in New York City (Eighth Avenue and Sixteenth Street, Tribeca on White Street, and the Williamsburg neighborhood of Brooklyn) and four other locations elsewhere in the United States, including one in Las Vegas and others in Austin, Los Angeles, and Chicago. In addition, Bar Works has planned to open locations offshore, including, without limitation, Istanbul, Turkey.

89.     In short, at the current time, Bar Works controls at least six shared workspace locations and has raised money to open other locations. Haddow formed other entities (the "Affiliates") for Bar Works' shared workspace locations (the "Locations"), including, without limitation, one entity joined as a defendant in this action, i.e., Bar Works Chambers Street.

90.     Haddow and Kyselova have owned and/or controlled the Affiliates, either directly or indirectly through the entity Bar Works or through employees.

91.     According to a private placement memorandum issued in the name of Bar Works to the public in or about December 2015 to raise $1.5 million by selling stock and convertible notes, Bar Works described its business plan as one "focused on acquiring long-term leases to premises [with] . . . under-utilized space." Bar Works acquires the leasehold interest in the shared workspace location (the "Location") in its own name or controls the leasehold interest through an Affiliate.

## THE CONCEALMENT OF HADDOW AND KYSELOVA

92.     From July 2015 through the present, so that the past transgressions of Haddow in the United Kingdom would not taint the public image of Bar Works, Haddow concealed his relationship to Bar Works. During this same time period, Haddow and Kyselova concealed their close association and Kyselova's relationship to Bar Works.

93.     Haddow and Kyselova have gone to great lengths to suppress information about Haddow's past, making sure that neither of their names appear in the prospectuses of the Bar Works entities.

94.     For example, Haddow invented a director/officer for Bar Works supposedly by the name of "Jonathan Black," and went to the extraordinary length of creating a spurious LinkedIn profile for this fictitious person. The inauthenticity of the LinkedIn page for Mr. Black was discovered by an internet journalist who compared Mr. Black's LinkedIn photo to that of one Frank Jones in Southlake Texas:



95.     In addition, the individual calling himself "Jonathan Black" admitted to then company CEO Franklin Kinard, that his real name was Renwick Haddow". (please see Affidavit of Franklin Kinard, former CEO of Bar Works, attached hereto as "Exhibit A".

96.     In addition, photographic and video images of Kyselova appear in marketing materials for Bar Works, including, without limitation, prospectuses, yet Haddow and Kyselova, have intentionally misidentified her as "Zoe Miller." (Franklin Kinard identified "Zoe Miller" as Kyselova in his affidavit, (previously referred to a "Exhibit A")).



## THE INVESTMENT SCHEME

97.     According to a recently published statement of Bar Works, the focus of the Defendant companies, since Bar Works' inception, has been to sell investments.

98.     The basic scheme was to attract as much investment capital as possible by selling as many ten-year subleases to "workspace units" at the various Locations. Each investor was to

make an investment in an amount not less than $25,000.00. In return for this investment, a "workspace" unit at the Location was assigned to the investor.

99. From inception, among other financial improprieties, Bar Works has commingled the investments solicited for each Affiliate/Location, misusing investments for reasons unrelated to the expenses of the Affiliates and unrelated to the Locations at which the investors received ten-year subleases.

## **THE MISLEADING PROSPECTUSES THAT OMITTED FACTS**

100. From inception, Bar Works used brochures or prospectuses to solicit investment contracts between the investing public and its Affiliates.

101. The prospectuses were authored, approved, and/or reviewed by each of the individual defendants. The prospectuses were signed by the fictitious person created by Haddow, i.e., "Jonathan Black." Further, Kyselova misidentifies herself as "Zoe Miller" in the prospectuses. All of the prospectuses were misleading in that they contained partial disclosures and omitted facts as alleged below.

102. The prospectuses issued by Bar Works and its Affiliates and transmitted to potential investors by electronic mail contained the following statements, among others:

(a) The investors are guaranteed annual income between fourteen and sixteen percent of the principal amount of the investment from sub-subleases of the workspace units to third party tenants[1];

---

[1] According to the prospectuses, the annual return depends upon the number of workspace units acquired by the investor (14% for a single workstation unit, 15% for two units (referred to as the "Wealth Starter" program), 15.5% for three units (referred to as the "Wealth Accelerator" program), and 16% for five or more units (referred to as the "Wealth Builder" program).

(b)     The investors are guaranteed the right to share in future rent increases paid by the third-party tenants, yet the investors have no right or obligation to manage the workspaces unilaterally assigned to the investors; and

(c)     The investors are guaranteed the repayment of the entire principal amount of the investment by no later than the end of the ten-year sublease, with the possibility of an earlier termination with full repayment and twenty-five percent "appreciation" on the principal amount of the investment.

103.    None of these assertions in the prospectuses were presented as a projection or forecast. Instead, assertions made about future performance were stated as guarantees. The rent payments were described as "minimum" returns, the right to repayment of principal at the end of the sublease was absolute and promised without any qualification, and the appreciation to be paid to the investor in the event of an earlier repurchase was described as a "minimum" return on investment.

104.    None of these assertions in the prospectuses were accompanied by any meaningful cautionary statements or caveats of any kind. Further, these assertions were made without the disclosure of any specific risks, or for that matter, any general boilerplate language or disclaimers. In other words, none of the language in these prospectuses, if construed reasonably and in *pari materia,* bespeaks any caution with regard to these assertions.

105.    These assertions in the prospectuses were made without a reasonable basis and with the specific awareness of undermining facts, none of which were disclosed to investors, including, without limitation, that the Bar Works Group was commingling the investments, among other financial improprieties, and the Bar Works Group did not have sufficient cash flow

to pay (a) the minimum annual returns guaranteed to the investors, (b) the expenses incurred to acquire leaseholds for the Locations, and (c) the expense of renovating the Locations.

106. Haddow knew that the cash flow of the Bar Works Group was insufficient.

107. In addition to these omissions about the unlikelihood of achieving the future performance guaranteed in the prospectuses, the prospectuses concealed other matters too. For example, the prospectuses touted investments in the "lease scheme" by suggesting that Bar Works would offer a "matched bargain" or "matched trade" facility where investors could supposedly sell their workspace units at any time if they chose to do so. In fact, Bar Works never made any meaningful effort to provide an efficient market for trading the workspace units, which were unregistered and for which there was never any prospect of registration. Bar Works never disclosed all that would be required to create a trading facility, which information, if provided, would have revealed that the trading facility was merely an empty promise about a concept or plan that was likely, if not certain, to be unachievable in the foreseeable future, if ever.

108. Haddow, who is currently operating a crowdfunding website, was the owner, officer, and director at Bar Works who oversaw all efforts to raise capital for the Bar Works entities. Based upon his prior background in the United Kingdom, his capital raising activities in the United States, and his regular contact with advisors of Bar Works, Haddow knew that the representations and omissions about a trading facility in the prospectuses were misleading.

109. In addition to misleading omissions about future performance of investments in workspace units and a trading facility to resell workspace units, the prospectuses issued by Bar Works were misleading based upon the following omissions, among others:

> (a) The prospectuses omitted any mention of Haddow's connection to the Bar Works entities and omitted any disclosure about his past, including his disqualification in 2008 by the Insolvency Service due to the fraud he had

committed at Premium Brands, Plc and the judgment in the High Court of Justice finding that he promoted the Capital Alternatives Scheme.

(b) The prospectuses omitted any mention of Kyselova's connection to either Haddow or the Bar Works entities.

(c) The prospectuses contained a "Letter from the Directors," yet the prospectuses concealed the identities of the directors.

(d) Notwithstanding these omissions that were intended to conceal the checkered past of Haddow in the United Kingdom, the prospectuses touted the plan of Bar Works to do business in the United Kingdom by refitting the famous red telephone boxes in various British cities as private offices for on-the-go workers. The plan was dubious because of, among other things, Haddow's unsavory past in the United Kingdom.

110. The individual defendants are well acquainted with each other, and each of them knew that the involvement of Haddow and Kyselova in the Bar Works entities was concealed and suppressed so as not to taint the public image of the Bar Works entities. The individual defendants at all times realized that the public would not invest in any entity connected to the Bar Works entities if the connection between Haddow or his close associate, Kyselova, to the Bar Works entities was disclosed.

## INVESTMENT PROCESS

111. From inception, in order to invest, each investor was required to wire to Bar Works' bank account the entire principal amount of the investment, i.e., $25,000.00 for each workspace unit, and to transmit by electronic mail to either Bar Works or Bar Works Management an application for the investment, which application in no respect negated the assertions in the prospectuses or disclosed the misleading omissions.

112. Thereafter, each investor was required to execute and return by electronic mail a ten-year lease (the "Lease") in which workspace unit(s) at the Location were assigned to the

investor; and a ten-year sublease (the "Sublease") that guaranteed minimum rent to the investor between fourteen and sixteen percent, depending upon the amount invested, the right to fifty percent of rent increases charged to third-party tenants after the second anniversary of the Sublease, and return of the investment by no later than the end of the Sublease.

113.   The Affiliate in which an investment is made is typically denominated as the "Landlord" in the Lease, and Bar Works Management is typically denominated in the Sublease as the Sublease Holder, which entity alone has the right and obligation to manage the workspace units assigned to each investor. Meanwhile, the investor is denominated as the "Lease Holder" in both the Lease and the Sublease without any right to manage the workspace units assigned to the investor.[2]

114.   Neither the Lease nor the Sublease negated in any respect the false assertions that were made in, nor disclosed in any respect the matters that were omitted from, the prospectuses. The Lease and the Sublease are multiple writings that incorporate each other and constitute a single investment contract.

115.   By this investment scheme, Bar Works has solicited millions of dollars in investments for each of the Locations.

116.   As of February 24, 2017, Bar Works had raised $22.83 million in capital through the sale of investments in workstation units.

**FIRST QUARTER OF 2017**

117.   It is now known that in or about the first quarter of 2017, Bar Works was experiencing "serious operational problems" in a "difficult restructuring" of the Bar Works

---

[2] If the investment contract were a true real estate lease, one would expect the Affiliate to be named the "Lease Holder," the investor the "Sublease Holder," and Bar Works Management the "Sub-Sublease Holder."

entities. Among other problems, Bar Works was having trouble with its "banking facilities," cash flow, and the completion of costly renovations. As a result, Bar Works was in a "chaotic" state.

118.    As a result of the commingling, among other financial improprieties, the Bar Works Group was running out of cash flow to pay (a) the minimum income that had been promised to each investor, (b) the expenses of acquiring leaseholds for the Locations, and (c) the expense of renovating the Locations for the shared workspaces.

## PLAINTIFFS' INVESTMENTS

119.    From 2015 to 2017 the Bar Works Investors were approached individually, either through the Defendants themselves or through brokers, and introduced to Bar Works and the investment program for its lease scheme.

120.    During that time, the Bar Works Investors paid a combined total of approximately $4,100,000.00 for 146 units, the specific details of each individual investor, including the amount of his/her payment and the number of units purchased, is attached here to as Exhibit B.

121.    By a series of separate wires to the Bar Works' bank account, Plaintiffs transferred the total sum of approximately $4,100,000.00 to Bar Works for investments in the defendant entities.

122.    Before Plaintiffs invested in each location, Bar Works transmitted prospectuses to the Plaintiffs. These prospectuses contained the same statements and omissions described above in paragraphs 100 through 110.

123.    In addition, none of these prospectuses disclosed anything about the "serious operational problems" or "difficult restructuring" described in paragraph 117 above.

124. Bar Works delivered to each of the 62 individual Bar Works Investors a Lease and a Sublease Agreements for the investments made in Bar Works, for a 10 year term.

## THE PONZI SCHEME UNRAVELS

125. Beginning in or about April 2017, there were numerous defaults in the obligations owed to investors to make guaranteed monthly payments under the Subleases.

126. On April 11, 2017, Bar Works, through its then CEO Franklin Kinard, told investors that guaranteed minimum payments would be delayed, as it was necessary to send the rent payments in batches due to difficulties with "banking facilities" as the result of a "large and growing volume of banking transactions" and a "broad international client base" that had caused a "significant increase in banking costs." No mention was made in April 2017 of the "serious operational issues" or "difficult restructuring" that he had been hired to handle and resolve in 2016.

127. In May 2017, there was a breach of the obligation to make guaranteed monthly payments due to Plaintiffs according to the prospectuses and/or Subleases they each received.

128. On May 11, 2017, Bar Works next stated that the payment delays were actually the result of banks being "nervous about Bar Works making many individual wire transfers around the world," and a determination that Bar Works' "liquidity was tied up." Nonetheless, Bar Works stated that guaranteed monthly payments would resume "shortly after June 1, 2017, when other Locations of Bar Works were scheduled to launch." Approximately two weeks later, Kinard admitted for the first time that he actually had been employed by Bar Works in 2016 to "execute a difficult restructuring" at Bar Works as a result of "serious operational problems," and that he was now "leaving the company," after having decided during the restructuring that

unspecified Locations must be closed or abandoned with investors in these Locations to be transferred to other Locations that would continue to operate.

129.     Bar Works further stated that the guaranteed monthly payments would resume according to a timetable that would be determined by unspecified managers of Bar Works.

130.     None of the Plaintiffs have received any of the guaranteed monthly payments since April 2017 as provided for in the prospectuses or the Subleases that the Plaintiffs received.

131.     Based upon the foregoing, Plaintiffs alleges that Bar Works entities are insolvent, that Plaintiffs were duped into making investments into a fraudulent investment program, which, in reality, is another Ponzi scheme masterminded by Haddow, whose connection to the Bar Works defendants was concealed by the individual defendants, and that the Plaintiffs stand to lose their entire investment of $4,100,000.00.

## BAR WORKS' LEASING PROGRAM IS A SECURITY OR AN INVESTMENT CONTRACT UNDER FEDERAL LAW

132.     Each investment made by Plaintiffs to participate in the Bar Works' leasing scheme qualifies as an investment contract or security under federal law.

133.     All of the prospectuses used by Bar Works refer to (a) the lump-sum payments to acquire subleases as "investments," and (b) the persons, such as, Plaintiffs, who pay $25,000.00 for each workspace unit, as "investors."

134.     The Bar Works defendants have routinely admitted in prospectuses and internet postings from 2015 through the present that the acquisition of workspace units in the leasing scheme is an "investment."

135.    Moreover, since inception through the date on which Plaintiffs made their final investment, Bar Works stated on its website, without explanation or further disclosure, that Bar Works is "registered" with the United States.[3]

136.    Upon information and belief, Haddow, who holds himself out as a search engine optimization executive, is responsible for the content of the website.

137.    Plaintiffs, like other members of the public who wired funds to Bar Works, have invested substantial sums of money.

138.    The investments by Plaintiffs and others were made in a common enterprise in that the fortunes of each of the investors, were interwoven with and dependent on the efforts and success of those seeking the investments or other third parties, including Bar Works, Bar Works Management, and/or Bar Works Chambers St.

139.    All of the investors, including Plaintiffs, expected profits from the efforts of others in the sense that the investors were dependent upon the alleged entrepreneurial and management skills of other persons, including Bar Works, Bar Works Management, and/or Bar Works Chambers St. upon whom the investors had no reasonable alternative but to rely.

## LEGAL BASIS FOR THE LIABILITY OF EACH DEFENDANT

140.    Bar Works Chambers Street is liable to the Plaintiffs as the sellers of the securities to Plaintiffs.

141.    In the counts asserted below, Bar Works is liable to each of the Plaintiffs based upon its having solicited Plaintiffs to purchase the unregistered securities and its acceptance of the funds that were wired by each of the Plaintiffs to purchase the securities. In addition, Bar

---

[3] In fact, neither Bar Works nor any of the corporate defendants, has ever filed a registration statement with the SEC or any comparable state agency.

Works is liable based upon its control of Bar Works Management and the Affiliates, Bar Works Chambers Street.

142.     In the counts asserted below, Bar Works Management, in the case of the investments by Plaintiffs in Bar Works Chambers Street, is liable based upon its direct participation in the sale of Subleases to the plaintiffs and their promises to pay minimum monthly income to the Plaintiffs and the obligation to repay the entire principal amount of the investments at the end of the term of the Subleases that were executed or to be executed in connection with Plaintiffs' investments. In addition, Bar Works and Bar Works Management controlled the Locations of Bar Works Chambers Street.

143.     In the counts asserted below, the individual Defendants are liable based upon their being persons who controlled, directly or indirectly, the Bar Works entities. At all times material hereto, the individual Defendants were directors, officers, and/or direct/beneficial owners of Bar Works and Bar Works Management. Each of the individual defendants have executed documents in which they have identified themselves as officers or directors of Bar Works, which entity has been described in the prospectuses, marketing materials, and on the Bar Works' website as the sponsor of the leasing/investment scheme, the parent corporation of Bar Works Management, and in control of the Locations and the Affiliate, Bar Works Chambers.

144.     Further, Haddow signed or caused to be signed prospectuses, Leases and Subleases with the fictitious name, "Jonathan Black," including, without limitation, prospectuses that were furnished to each of the Plaintiffs for their investments in Bar Works and Bar Works Chambers Street.

## LOSSES SUSTAINED BY PLAINTIFFS

145.     As a result of the investment by Plaintiffs in Bar Works, Plaintiffs each lost the total investment amount paid, less the monthly payments received, i.e., the total sum of approximately $4,100,000 (a detailed summary of the amount lost by each individual investor is attached hereto as "Exhibit B")

146.     All of the Defendants are jointly and severally liable to Plaintiffs for their losses.

## COUNT ONE FOR SALE OF UNREGISTERED SECURITIES (VIOLATION OF SECTION 12(A)(1) OF THE SECURITIES ACT OF 1933)

147.     The Plaintiffs re-allege and hereby incorporates the allegations made in paragraphs 1 through 146.

148.     This cause of action is asserted against all of the Defendants.

149.     The Plaintiffs have purchased unregistered securities.

150.     Each investment purchased by the Plaintiffs constitutes a "security" under federal law 15 U.S.C. § 78c(a)(10).

151.     In violation of the Securities Act of 1933, 15 U.S.C. § 77e, when the securities were offered for sale and sold to the plaintiff, none of the securities was registered with the SEC, 15 U.S.C. § 77f.

152.     All of the offers to sell and sales that are the subject of this action involved the use of the mails or other means or instrumentalities of interstate commerce.

153.     The Defendants are strictly liable to the Plaintiffs for the refund of all consideration paid by the Plaintiffs to purchase these unregistered securities. 15 U.S.C. § 77l(a)(1).

154. Based upon the foregoing, all of the defendants, are jointly and severally liable to the Plaintiffs for the consideration paid to invest in Bar Works based upon the Plaintiffs' purchase of an unregistered security from Bar Works.

## COUNT TWO FOR MISLEADING OMISSIONS IN PROSPECTUSES (VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT OF 1933)

155. The Plaintiffs re-allege and hereby incorporate the allegations made in paragraphs 1 through 146.

156. This cause of action is asserted against all of the Defendants.

157. The Plaintiffs are the actual purchasers of securities.

158. All of the offers to sell securities and sales of securities to the Plaintiffs involved the use of the mails or other means or instrumentalities of interstate commerce.

159. Before the Plaintiffs purchased any of the unregistered securities, the prospectuses were issued in connection with the public offerings of the securities.

160. All of these prospectuses were misleading because they contained omissions about (a) the cash flow of Bar Works, (b) the commingling of investments in Bar Works, (c) the unlikelihood that a trading facility would ever be established and operated to create an efficient market for the workspace units, (d) the substantial connection between Bar Works and Haddow, a bad actor disqualified in the United Kingdom to serve as a director, who also was adjudicated to be the promoter of illegal investments in a Ponzi scheme, (d) the non-existence of "Jonathan Black," a fictitious person created to conceal the involvement of Haddow, and (e) the substantial connection between Bar Works and Haddow's close associate, Kyselova, who was intentionally misidentified.

161. Each omission in the prospectuses was material in that any reasonable investor would have considered each of these omitted matters to be important information about a start-up enterprise, and any reasonable investor would have wanted to take the omitted matter into account before deciding to invest many thousands of dollars to purchase these securities. Stated another way, each of the omitted matters would have significantly altered the total mix of information available to a potential investor, such as the plaintiff, to whom cautionary statements were not furnished before investing.

162. Before the Plaintiffs purchased these securities, the Plaintiffs were furnished with the prospectuses.

163. Prior to the investments by the Plaintiffs, there were no disclosure of any of the material facts omitted from the prospectuses.

164. The Plaintiffs relied upon the material omissions to purchase the securities. The Plaintiff would not have purchased any of the securities but for the material omissions.

165. With respect to one or more of the omitted matters, none of the individual Defendants can meet his or her burden to prove that he or she did not know that the matter(s) had been concealed in the prospectuses.

166. The knowledge of the individual Defendants, each of whom was an owner, officer, and/or director of Bar Works, Bar Works Management, and/or Bar Works Chamber Street, is legally imputed to all of the entities named as Defendants in this action.

167. The Defendants are liable to the Plaintiffs for all losses causally related to the material omissions.

## COUNT THREE FOR MISLEADING OMISSIONS
## (VIOLATION OF SECTION 10(B) OF THE
## SECURITIES ACT OF 1934 AND SEC RULE 10B-5)

168.    The Plaintiffs re-alleges and hereby incorporates the allegations made in paragraphs 1 through 146.

169.    This cause of action is asserted against all of the Defendants.

170.    The Plaintiffs are the actual purchaser of securities.

171.    All of the offers to sell securities and sales of securities to the Plaintiffs involved the use of the mails or other means or instrumentalities of interstate commerce.

172.    Since Bar Works' inception in 2015 and through the date on which Plaintiffs made their final investment decisions, Bar Works, on its website, stated that Bar Works is registered with the United States. The meaning of this misleading statement has not been explained, nor has there been any disclosure that none of the Bar Works Group and none of their securities has been registered with the SEC or with any comparable state agency.

173.    At all times, based upon this misleading statement on the website, there existed a duty to disclose that none of the Bar Works Group had registered securities with the SEC or with any comparable state agency.

174.    This omission was material in that any reasonable investor would have considered the omitted matter to be important information about Bar Works, and any reasonable investor would have wanted to take the matter into account before deciding to invest many thousands of dollars to purchase these securities, which, in fact, were unregistered. Stated another way, the omitted matter would have significantly altered the total mix of information available to potential investors, such as the Plaintiffs, to whom no explanation was ever provided regarding the meaning of the statement on the website that Bar Works was "registered" with the United States.

175.    Based upon the misleading statements in the prospectuses, discussed more fully above in paragraphs 100 to 110, there was a duty at all times on the part of the Defendants to disclose material matters that were omitted from the prospectuses.

176.    Before the Plaintiffs purchased each of the securities, the Plaintiffs were directed to the website and were furnished with the prospectus applicable to the investment.

177.    Prior to each investment by the Plaintiffs, there was no disclosure of any of the material facts omitted from the prospectus or the website.

178.    The Plaintiffs relied upon the material omissions to purchase each of the securities.

179.    The Plaintiffs would not have purchased any of the securities but for the material omissions.

180.    The material omissions are related to the losses that the Plaintiffs have suffered, which losses are causally related to the material omissions. Based upon the existence of the material matters that were omitted from the prospectuses and the website, the securities are valueless. Since the material matters omitted have come to light, guaranteed payments were delayed, then suspended indefinitely; Kinard has resigned; and, on May 25, 2017, the website of Bar Works was rendered inaccessible on the internet and it was covered by a banner that read "Closed for Investment."

181.    The Plaintiffs' purchase of the securities was the result of deception and fraudulent concealment of material matters, and there was at all times an intent to deceive, manipulate, or defraud on the part of the Defendants.

182.    The individual Defendants had knowledge of one or more of the omitted matters as alleged above. Alternatively, each of the individual Defendants was severely reckless in his or her decision not to disclose the omitted matters.

183.    The knowledge of the individual Defendants, each of whom was an owner, officer, and/or director of Bar Works, Bar Works Management, and/or Bar Works Chamber Street, is legally imputed to all of the entities named as defendants in this action.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request the entry of a judgment in the amount of $4,100,000 (the "Judgment Amount"), together with costs and interest. The Defendants should be adjudicated as liable, jointly and severally, for the entire Judgment Amount and all costs and interest awarded to the Plaintiffs. The Defendants should also be liable for the Plaintiffs' reasonable attorneys' fees.  Plaintiffs additionally demand punitive damages in the amount of $20,000,000.  Additionally, such further relief ought to be ordered by the Court as determined to be warranted, including, without limitation, holding that all the agreements and/or contracts between the Plaintiffs and the Defendants are forthwith rescinded, null and void, have no further legal affect and are not enforceable in any manner, all because they were entered into via the fraud of the Defendants as stated above in this Complaint.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs demand a jury trial on all claims and issues triable by right to a jury.

Dated this 19th day of July, 2017.

Respectfully submitted,

*/s/ Robert Bell*_____

John J. Maalouf, Esq.
Robert Bell, Esq.
MAALOUF ASHFORD & TALBOT, LLP
40 Wall Street, 28th Floor
New York, NY 10005
(212) 537-5035 (telephone)
(212) 537-9268 (facsimile)

Attorneys for the Plaintiffs